UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SANJAY TRIPATHY,

                                        Plaintiff,

        - against -

ROBERT McCLOSKEY, SHARON FROST,                    **OPINION & ORDER**
GEORGE J. DASH, EDWARD BURNETT,
PATRICK DOLAN, RICHELLE MOSSEY-                      No. 21-CV-6584 (CS)
HARRIS, ANDREA N. SCHNEIDER, STEPHEN
BRANDOW, JEFF McKOY, ANTHONY J.
ANNUCCI, ANDREW M. CUOMO, and the
STATE OF NEW YORK,

                                        Defendants.
-------------------------------------------------------------x

<u>Appearances</u>:

Sanjay Tripathy
Collins, New York
*Pro se Plaintiff*

Bahiya Lawrence
Assistant Attorney General
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is Plaintiff's motion for a preliminary injunction.  For the reasons stated

below, Plaintiff's motion is DENIED in part and GRANTED in part.

I.      **BACKGROUND**

        The following facts are undisputed except where noted.[1]

_____

        [1] Neither party has requested an evidentiary hearing, although Plaintiff requests oral
argument "if it helps to decide the motion expeditiously."  (ECF No. 73 ("P's Reply") at 11.)
The Court sees no need for an evidentiary hearing or oral argument at this stage.

A.    **Facts**

Plaintiff is currently serving a seven-year prison sentence in custody of the State of New

York.  (ECF No. 1 ("Compl.") at 11.)  He has been incarcerated since approximately August 16,

2018 and will be released, at the earliest, on May 15, 2024.  (*Id.* at 12, 18.)  As of October 19,

2021, Plaintiff is incarcerated at Collins Correctional Facility in Collins, New York.  (*See* ECF

No. 72.)  Plaintiff was incarcerated from August 16, 2018 to January 21, 2021 at Gowanda

Correctional Facility in Gowanda, New York and from January 21, 2021 until October 19, 2021

at Fishkill Correctional Facility in Beacon, New York.  (*See id.*; Compl. at 18.)[2]

Plaintiff is a practicing, life-long adherent to Hinduism.  (Compl. at 10.)  He asserts that

one of his core and sincerely held religious beliefs is to neither eat nor come into "close personal

contact" with beef or pork.  (*Id.* at 13.)  DOCCS serves beef in the main messhall of its facilities.

(*Id.*; Olney Decl. ¶¶ 5-6, Ex. A.)  DOCCS also serves a meat-free alternative at every meal.

(Olney Decl. ¶¶ 8-9.)  DOCCS used to serve pork, but no longer does so.  (Compl. at 13; P's

Reply Ex. A.)

Plaintiff asserts that the cross-contamination that occurs between beef and non-beef

products in DOCCS kitchens violates his religious dietary restrictions.  (ECF No. 47 ("P's

Reconsideration Br.") ¶ 8.)  Specifically, Plaintiff asserts that when beef is served in the messhall

_____

[2] The New York Department of Corrections and Community Supervision ("DOCCS")
transferred Plaintiff from Fishkill to Collins after Plaintiff filed his Complaint and initial briefs in
this action, and three days before Defendants filed their opposition.  Plaintiff states that the same
conditions of which he complained at Fishkill are present at Collins.  (ECF No. 72.)  And
Christine Olney, DOCCS Director of Correctional Food and Nutritional Services, stated in her
declaration that the DOCCS menu is the same statewide and cannot be altered for a single
facility.  (ECF No. 69-2 ("Olney Decl.") ¶ 4.)  Defendants have likewise submitted a declaration
from DOCCS Director of Ministerial, Family and Volunteer Services, Nancy K. Fernandez,
which speaks to statewide DOCCS policies.  (ECF No. 69-3 ("Fernandez Decl.").)  Accordingly,
except where noted, the Court assumes for purposes of this motion that Plaintiff's allegations,
and the parties' arguments, are equally applicable to conditions at Fishkill and Collins.

it is cooked in the same kitchen by the same cooks, served using the same utensils, and served in the same food line as the vegetarian options.  (*Id.*)  Because of the close proximity and risk of cross-contamination, Plaintiff asserts that he eats in the messhall only when he is very hungry and as infrequently as possible.  (*Id.*)  He estimates that he only eats in the messhall at three to four of the twenty-one meals served there per week, and to avoid going hungry he has often had to rely on food brought in by family members or purchased from the commissary.  (P's Reconsideration Br. at 4-5.)  Plaintiff asserts that he lost access to personal food due to the transfer to Collins, and as a result has lost over ten pounds.  (P's Reply at 8.)

### 1.      Plaintiff's Grievances and Attempts at Informal Resolution

On April 6, 2021, Plaintiff filed a grievance at Fishkill regarding these claims, asserting that the "[o]nly and sole cure, is either full removal of all beef products being served in inmate Messhall, or have segregated facilities (operations)" in which no pork or beef are served. (Compl. at 64.)[3]  On April 29, 2021, he received an "unfavorable" response from the Inmate Grievance Resolution Committee, stating that there is no special diet for Hindus and recommending that DOCCS provide alternatives that do not contain beef.  (*Id.* at 65-66.)  He appealed to the facility Superintendent, (*id.* at 66), who denied the appeal on May 7, 2021, with a note that "DOCCS does not have a special diet menu for Hindus at this time," (*id.* at 67). Plaintiff then appealed to the Central Office Review Committee ("CORC"), which upheld the Superintendent's determination; noted that "other than the Muslim religion, no other religion, thus far, has claimed that they cannot be in close personal contact with a restricted food, only that the restricted food cannot be consumed"; and explained that it is "not always possible to

---

[3] Plaintiff annexed several exhibits to each of his filings, but not all exhibits are individually numbered or lettered.  For ease of reference, citations to these materials are to the page number generated by the Court's electronic filing system ("ECF").

provide all of the rites, rituals, and meal considerations for each faith group as they may be practiced in the outside community."  (ECF No. 38 ("P's Br.") at 15.)  Further, CORC found that there was "insufficient evidence of malfeasance by staff," and advised Plaintiff to confer with the Coordinating Chaplain and the "FSA"[4] to address his religious and dietary needs.  (*Id.*).

In addition to pursuing the formal grievance process, Plaintiff explored other avenues for resolution of this issue.  He asserts that he met with Coordinating Chaplain Father George Dash and Catholic Chaplain Vincent Porcelli on May 20, 2021, but did not obtain the relief he sought.  (*See* Compl. at 59.)  He also wrote directly to Stephen Brandow, DOCCS Deputy Commissioner of Administrative Services, and Sharon Frost, DOCCS Deputy Superintendent of Administration for Fishkill.  (Compl. at 51-55.)  Mr. Brandow responded on May 27, 2021, stating that DOCCS is committed to meeting religious needs but may not be able to do so for each faith group in the same way that religion is practiced outside a correctional facility.  (*Id.* at 57.)  Mr. Brandow also asserted that the issues raised by Plaintiff "ha[ve] been litigated" and "withstand[] scrutiny under the Equal Protection Clause."  (*Id.*)  Finally, DOCCS Deputy Commissioner for Program Services Jeff McKoy, responding to a letter Plaintiff had sent to Acting DOCCS Commissioner Annucci, wrote to Plaintiff on October 8, 2021 (after the filing of the Complaint initiating this matter), advising Plaintiff that DOCCS "consults with outside religious authorities for direction regarding the faith tenets and religious needs of its incarcerated individuals," that alternative meals are available for those who cannot eat the "population meal," and that Plaintiff's concern had been appropriately addressed through the grievance procedure.  (P's Reply Ex. C.)

---

[4] "FSA" may stand for Food Services Administrator.

### 2.   DOCCS Food Services

DOCCS offers an alternative, meatless, entrée with each meal, and permits individuals in general population to select whichever entrée they prefer at each meal.  (Olney Decl. ¶¶ 8-9.) Fishkill (where Plaintiff was formerly confined) offers the option for inmates to buy food from the commissary and receive approved packaged food from visitors, but only specific food items (fruit and bread) may be removed from the messhall and consumed by inmates in their dormitories.  (ECF No. 69-4 ("Frost Decl.") ¶¶ 10-11.)[5]  Plaintiff's reply brief (submitted after DOCCS transferred him to Collins) suggests that Collins has similar policies in place.  (P's Reply at 7.)

In addition, DOCCS has a form ("Form 4202D1") that inmates can use to request a religious diet, which may be kosher or any "other Department approved religious diets/menus." (Fernandez Decl. Ex. A at 2; *see id.* ¶¶ 5-6.)  The form refers to a "religious menu for faith groups whose dietary requirements have been strongly supported on a theological basis."  (*Id.* Ex. A at 1; *see id.* ¶ 5.)  "Some Incarcerated Individuals have prepackaged meals designated for them according to prior approval."  (Olney Decl. ¶ 9.)[6]  Once a religious dietary restriction is approved and applied it is maintained by DOCCS even if the inmate is transferred between facilities.  (*Id.* ¶ 13.)

---

[5] Plaintiff appears to contest this latter representation by Defendants, stating that it is "a lie that [he] can bring back food and eat in his cube."  (P's Reply at 7.)

[6] It is not clear whether Plaintiff would qualify for such a prepackaged option, and neither party states whether Plaintiff has been offered this option or whether it would meet Plaintiff's needs.

DOCCS does not have a record of Plaintiff submitting Form 4202D1.  (Fernandez Decl. ¶ 8.)[7]  Plaintiff states that he has never been given this Form to request a religious accommodation for a Hindu diet, while noting that his letter requests, grievances, and appeals have all been denied.  (P's Reply at 7.)  In any event, the diet Plaintiff seeks is apparently not "Department approved," (Fernandez Decl. Ex. A at 2), as DOCCS does not offer a special menu specifically for individuals practicing Hinduism, (Compl. at 66-67; P's Reply at 16).

DOCCS serves three meals a day to approximately 32,000 incarcerated individuals, and gets quarterly reports through its Inmate Liaison Committees on which food items are popular. (Olney Decl. ¶ 2.)  Beef is consistently noted as a popular food item among inmates, particularly during holiday seasons.  (*Id.* ¶ 10.)  DOCCS orders beef from its vendors approximately three to four months in advance, and discontinuing a food product requires one month's notice (and for DOCCS to deplete its current inventory).  (*Id.* ¶¶ 6-7.)

### B.    Procedural History

On August 4, 2021, Plaintiff filed his Complaint, naming a number of DOCCS officials (including officials from Gowanda and Fishkill), former Governor Andrew Cuomo, and DOCCS as Defendants.[8]  He brings claims for injunctive relief, as well as $2,557,000,000 in damages, under 42 U.S.C. § 1983 for violations of his First and Fourteenth Amendment rights and under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc ("RLUIPA").  (Compl. at 8, 39.)

---

[7] Defendants do not assert that Plaintiff has failed to exhaust his administrative remedies. (*See* ECF No. 69 ("Ds' Opp.").)

[8] On August 9, 2021, the Court dismissed DOCCS as an improper defendant, (ECF No. 3), and on August 18, 2021 granted leave to substitute the State of New York, (ECF No. 20).

The Complaint also included an application for a temporary restraining order and preliminary injunction, asking the Court to Order that DOCCS immediately stop serving beef in all facilities statewide.  (*Id.* 37-38.)  Plaintiff requested in the alternative that the Court order DOCCS to establish in Fishkill (where Plaintiff was held at the time) "segregated Messhall facilities (operations)" in which there would be a separate messhall without beef or pork.  (P's Br. at 9.)[9]  In a later submission, Plaintiff sought either "full removal of beef products from the inmate Messhall, or 100% separation of beef products from what is provided to the Petitioner." (P's Reconsideration Br. at 5.)  In Plaintiff's reply brief he requested an order that would give DOCCS officials a limited time in which to implement a solution in consultation with Plaintiff. (P's Reply at 9.)

The Court initially denied Plaintiff's request for preliminary injunctive relief, on August 9, 2021, without prejudice to renew the motion a later date.  (ECF No. 3.)  Plaintiff renewed his motion for a temporary restraining order and a preliminary injunction on September 7, 2021, (ECF No. 37.)  On September 10, 2021, the Court denied the renewed motion, finding that "Plaintiff has not explained why the availability of beef to other prisoners requires him to have close contact with beef, nor has he explained why the available vegetarian diet does not meet his religious needs."  (ECF No. 40.)  On September 16, 2021, Plaintiff moved for reconsideration and explained, in response to the Court's questions, how DOCCS policies – and specifically, cross-contamination within the Fishkill kitchen – required him to come in close contact with beef.  (ECF Nos. 46, 47.)  On the same day the Court denied the motion without prejudice to

---

[9] The second option, which was listed in the Background sections of Plaintiff's briefs in support of his preliminary injunction motion and in support of reconsideration, is absent from the Conclusion of Plaintiff's pleadings, which specifically petitions the Court for an order immediately banning beef from the messhalls of all DOCCS facilities statewide.  (*See* P's Br. at 13; P's Reconsideration Br. at 12.)

renew because the Plaintiff had not yet properly served Defendants and the New York Attorney

General had not yet entered an appearance.  (ECF No. 49.)  The Court advised that it would take

up the matter once Defendants responded.  (*Id.*)  On September 22, 2021, the New York

Attorney General's Office (the "AG") appeared on behalf of the State of New York, Robert

McCloskey, and Sharon Frost.  (ECF No. 52.)  The AG has since appeared on behalf of

Defendants Anthony Annucci, Jeff McKoy, Edward Burnett, Andrea Schneider, Patrick Dolan,

and Father George Dash.  (*See* ECF No. 77.)[10]

　　After the AG entered an appearance, Plaintiff opted not to file a new brief and referred

the Court to his previous briefs (in support of his original preliminary injunction motion and in

support of his reconsideration motion), and the Court set a briefing schedule.  (ECF No. 59.)

Defendants filed their opposition to Plaintiff's preliminary injunction motion on October 22,

2021.  (Ds' Opp.)  Plaintiff filed a reply on November 5, 2021.  (P's Reply.)

　　After extensive exchanges with the Court regarding service of process, on October 18,

2021, the Court gave Plaintiff until November 3, 2021 to successfully complete service and has

not since extended that deadline.  (ECF No. 65.)  The AG's office, as of October 22, 2021,

asserted that no Defendant had properly been served, and reserved its objections to personal

jurisdiction and defects in service.  (Ds' Opp. at 1 n.1.)  While the status of service is somewhat

unclear, it appears that Plaintiff has not perfected service on any Defendant.  (ECF Nos. 74,

76.)[11]  In any case, Defendants merely reserve their rights in this regard, and do not argue that

---

[10] Two Defendants, Reverend Richelle Mossey-Harris and Stephen Brandow, remain
unrepresented; the AG's office states that they have not requested representation and, like all
Defendants, had not been properly served as of October 22, 2021.  (Ds' Opp. at 1 n.1.)

[11] Plaintiff stated on November 5, 2021 that Defendants have not provided him with
acknowledgments of receipt of service, which is required for service by mail in New York.  *See
Prokopiou v. Long Island R.R.*, 06-CV-2558, 2007 WL 1098696, at *6 (S.D.N.Y. Apr. 9, 2007)

the relief Plaintiff seeks should be denied for lack of proper service or lack of personal jurisdiction.  (Ds' Opp. at 1 n.1.)

## II.   LEGAL STANDARD

### A.   Preliminary Injunction

"A party seeking a preliminary injunction must demonstrate (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tip in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (cleaned up).

Most preliminary injunctions are prohibitory and seek only to maintain the *status quo* during the pendency of litigation.  *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).  A party seeking a mandatory injunction – one that alters the *status quo* by affirmatively commanding some act – bears a higher burden.  *Id.*  To obtain a mandatory injunction, a party must demonstrate a clear or substantial likelihood of success or that "extreme or very serious damage will result" if the injunction does not issue.  *Id.*; *see New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  This heightened burden also

---

(service by mail in New York is not complete "in the absence of [defendants'] waiver, return and acknowledgment of receipt of service or a showing by the plaintiff that he effected service properly within the period prescribed by Fed. R. Civ. P. 4(m)").  Some Defendants are actually aware of the lawsuit even if not properly served, having requested representation by the AG.  Further, the State of New York is a proper defendant in a case seeking injunctive relief under RLUIPA, *see Smith v. New York*, No. 17-CV-558, 2017 WL 6629228, at *16 (N.D.N.Y. Oct. 20, 2017), *on reconsideration in part sub nom. Smith v. New York State*, 2018 WL 346138 (N.D.N.Y. Jan. 10, 2018), and the State obviously has actual knowledge.  The Court will send Plaintiff copies of the unreported decisions cited in this Opinion and Order.

applies to preliminary injunctions that would "provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs.*, 60 F.3d at 33-34.

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Capstone Logistics Holdings, Inc. v. Navarrete*, 736 F. App'x 25, 26 (2d Cir. 2018) (summary order) (cleaned up) (emphasis in original).

### B.   *Pro se* Litigants

Submissions by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (cleaned up).  Nevertheless, "threadbare recitals" and "mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations" that the plaintiff has not pleaded.  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (cleaned up).

## III.   DISCUSSION

### A.   Likelihood of Success on the Merits

#### 1.   RLUIPA

RLUIPA provides, "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a);

ADD

*Williams v. Annucci*, 895 F.3d 180, 188 (2d Cir. 2018).  Under RLUIPA, if a plaintiff shows that

the state has imposed a substantial burden on the exercise of sincerely held religious beliefs, "the

burden then shifts to the state to demonstrate that the challenged policy or action furthered a

compelling governmental interest and was the least restrictive means of furthering that interest."

*Williams*, 895 F.3d at 188 (cleaned up).

Defendants argue that Plaintiff has failed to show that his sincerely held beliefs are

substantially burdened by DOCCS policies.  (Ds' Opp. at 5-9.)[12]  "[A] substantial burden on

religious exercise exists when an individual is required to choose between following the precepts

of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of

her religion on the other hand."  *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338,

348 (2d Cir. 2007) (cleaned up).  In the context of religious dietary restrictions, inmates have "a

right to a diet consistent with his or her religious scruples," *Ford v. McGinnis*, 352 F.3d 582, 597

(2d Cir. 2003), but "[a]ll that is required for a prison diet not to burden an inmate's free exercise

of religion is 'the provision of a diet sufficient to sustain the prisoner in good health without

violating [his religion's] dietary laws,'" *Abdul-Malik v. Goord*, 96-CV-1021, 1997 WL 83402,

*6 (S.D.N.Y. Feb. 27, 1997) (quoting *Kahane v. Carlson*, 527 F.2d 492, 496 (2d Cir. 1975)).[13]

Plaintiff asserts that he regularly goes hungry in order to maintain his religious beliefs,

which require his meals to be prepared in a facility where there is no cross-contamination with

---

[12] Defendants do not appear to challenge that Plaintiff's beliefs are sincerely held.  Nor do they suggest that devout Hindus are permitted to eat food cross-contaminated with beef.

[13] *Abdul-Malik* was decided under the Religious Freedom Restoration Act ("RFRA"). The Supreme Court has explained that RLUIPA was modeled after RFRA and the "substantial burden" language mirrors the language in RFRA; thus, RLUIPA "allows prisoners to seek religious accommodations pursuant to the same standard as set forth in RFRA." *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (cleaned up).

beef.  While incarcerated at Fishkill, Petitioner asserts that he was going hungry attempting to avoid the messhall and often was "forced to cobble together food, either sent by his family or purchased from the Commissary."  (P's Reconsideration Br. at 4.)  He asserts that he only ate in the messhall at Fishkill three to four times per week, (*id.* at 5), and that he has gone hungry "more times than he can count," (*id.* at 10).  Since being transferred to Collins, Plaintiff asserts that the situation has worsened, and that he has lost over ten pounds because he lost access to personal food and has eaten in the messhall only sporadically.  (P's Reply at 8.)

Defendants argue, in effect, that Plaintiff has not availed himself of the options DOCCS provides that would permit him to sustain himself without violating his religious beliefs.  They point out that Plaintiff has never submitted a Form 4202D1 requesting a special religious meal and argue that "[t]here is no reason to be believe he would not receive a religious accommodation in this regard were it requested."  (Ds' Opp. at 6.)  The Court is unpersuaded by that contention for two reasons.  First, the Form 4202D1 by its terms is limited to approved religious diets, and DOCCS offers no approved Hindu diet.  Second, if there were an option that DOCCS could offer in response to a Form 4202D1 that would address Plaintiff's concerns, one wonders why it did not offer that option, or at least explore it with Plaintiff, prior to litigation – particularly given Plaintiff's extensive correspondence with prison officials, exhaustion of the grievance process, and meeting with prison Chaplains.  In any case, Defendants fail to provide specific facts that would allow the Court to infer that such an accommodation would not substantially burden Plaintiff's beliefs.  While Ms. Olney's declaration alludes to "prepackaged" meals that are available to some qualifying inmates – and such prepackaging, depending on the specifics, could potentially address Plaintiff's concerns about cross-contamination – Defendants

do not state that this is an accommodation available to Plaintiff or demonstrate that it would address his cross-contamination concerns.[14]

Defendants address Plaintiff's cross-contamination concern by citing *Simmons v. Robinson* for that case's finding that the Religious Alternative Menu ("RAM") options apparently then offered were not subject to cross-contamination at the Sing Sing prison.  (Ds' Opp. at 7) (citing *Simmons v. Robinson*, No. 07-CV-7383, 2011 WL 31066, at *3 (S.D.N.Y. Jan. 4, 2011)).  If the record here approached that in *Simmons*, Plaintiff might well fail to show a substantial burden.  But Defendants have not provided evidence that would permit me to make such a finding.  In concluding that the plaintiff's religious beliefs were not substantially burdened, the *Simmons* court relied heavily on a declaration from Sing Sing's food administrator which detailed the sanitation procedures in place and explained that they had been designed specifically with the religious requirements of Muslim inmates in mind.  *Simmons*, 2011 WL 31066, at *5.  Further, the *Simmons* defendants had an expert opinion from an Imam who had toured Sing Sing's dining facility and concluded that the sanitation policies and procedures complied with Islamic law.  *Id.*  Defendants have not put forth such evidence here.  They have provided no information regarding how Fishkill or Collins or any of its facilities handle beef, let

---

[14] Some of Defendants' arguments either ignore or misread Plaintiff's concerns, and are thus unhelpful.  For example, Defendants argue that Plaintiff can always eat the meatless alternative meal and remove food from the messhall and eat in his dormitory, (Ds' Opp. at 4, 6), but this ignores Plaintiff's concerns about cross-contamination:  "the question is not where [Plaintiff] eats[;] the question is all food served (cooked) is contaminated with proximi[]ty to beef," (P's Reply at 7).  Defendants also misrepresent Ms. Frost's affidavit in this latter regard: Plaintiff was not, when incarcerated at Fishkill, free to remove all food from the messhall and eat in his dormitory – according to Ms. Frost, only "fruit and bread" can be removed from the messhall and consumed in a dormitory.  (Frost Decl. ¶ 10.)  Thus, even if Plaintiff's sole concern was eating in the same messhall as others eating beef (and that is not his sole concern), the representation that he could simply take all his meals from the messhall to his dormitory appears to be incorrect based on Defendants' own submissions.

alone whether similar sanitation procedures are in use or could be used to avoid the cross-contamination of which Plaintiff complains.  Nor do they even state that the RAM is still an offered option.[15]  From what the Court can tell, no particular effort to avoid beef cross-contamination is undertaken, no menu free of such contamination is offered, and no Hindu religious authority has been consulted.

The evidence put forth by Defendants does, however, suggest that Plaintiff may not be at risk of "close personal contact" with beef products as often as he suggests.  Plaintiff, in response to the Court's inquiry why the available vegetarian options did not satisfy his religious requirements, responded that "[w]hen beef food products are served to inmates in the inmate Messhall they are cooked in the same kitchen, by the same cooks, served in the same utensils, and served in the same food line with all other products including vegetarian food, thus splashing across other foods . . . ."  (P's Reconsideration Br. at 4.)  He further states that because of this issue he only eats, on average, three to four meals out of twenty-one served in the messhall each week.  (*Id.* at 5.)  But a review of the General Confinement Menu annexed to Ms. Olney's declaration shows that, on average, beef is only served at roughly five to seven of the twenty-one meals in a week, leaving fourteen to sixteen meals at which the risks of the type of cross-contamination identified by Plaintiff are in theory not present.  (*See* Olney Decl. Ex. A.)[16]

_____

[15] While Defendants quote *Abdul-Malik*, a 1997 case, for the proposition that "RAM was designed to accommodate the needs of many religious groups who have special dietary requirements, including Muslims, Hindus, Seventh Day Adventists, Buddhists and Rastafarians," *Abdul-Malik*, 1997 WL 83402, at *3, they have not shown that the menu described remains in place, nor have they explained how this menu would accommodate Plaintiff's Hindu beliefs, if at all.  In short, Defendants have failed to create a record that supports the relevance of this citation.  Further, neither party explains whether this menu, if it remains available, is something that has been explored with Plaintiff.

[16] The Court assumes that the pots, pans, utensils, serving trays, etc. are washed after each meal, so there would be no risk of cross-contamination at one meal from beef having been

Nonetheless, Plaintiff has shown, at this stage, that he cannot eat in the messhall regularly without violating his religion's dietary laws, which constitutes a substantial burden on his beliefs, and Defendants have failed to effectively respond.  *See Ford*, 352 F.3d at 597; *see also Kanda v. Walker*, 09-CV-2197, 2010 WL 95203, at *4 (E.D. Cal. Jan. 6, 2010) ("[B]y refusing to provide plaintiff with the diet mandated by his religion, defendants are preventing him from engaging in conduct mandated by his faith . . . ."), *report and recommendation adopted*, 2010 WL 699173 (E.D. Cal. Feb. 25, 2010).  Such a burden is justifiable under RLUIPA only if Defendants can establish that this burden is "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).

Defendants argue that DOCCS has a compelling interest in continuing to serve beef in its facilities' messhalls.  (Ds' Opp. at 8.)  Under RLUIPA, courts are to give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Singh v. Goord*, 520 F. Supp. 2d 487, 499 (S.D.N.Y. Oct. 9, 2007) (cleaned up).  At the same time, RLUIPA "does not permit . . . unquestioning deference" to prison officials' assertions that granting a religious exemption would undermine a security interest.  *Holt*, 574 U.S. at 364.  "[I]nadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the RLUIPA's requirements."  *Jova v. Smith*, 582 F.3d 410, 416 (2d Cir. 2009) (cleaned up).  Further, the RLUIPA "test requires [prison officials] not merely to explain why [they]

---

served at an earlier meal.  Plaintiff's theory of cross-contamination – that beef products could "splash[] across" and contaminate vegetarian options prepared and served at the same time, (*see* P's Reconsideration Br. at 4) – seems to acknowledge the same.

denied the exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest." *Holt*, 574 U.S. at 364.

Defendants argue that the popularity of beef as a menu item, particularly during the holiday season, creates the risk that the removal of beef from not just one facility's menu, but statewide, would create security issues. (Ds' Opp. at 8.) They further argue that the alternative proposed by Plaintiff, that he be provided with separate facilities and dining operations, would be unworkable given the need to alter facility layout and assign additional security and kitchen staff. (*Id.* at 8-9.)

Whether or not these arguments establish a compelling government interest in continuing to serve beef to other inmates and in not providing Plaintiff with fully separate facilities, Defendants have not met their burden under RLUIPA because they do not argue that their policies are the least restrictive means of furthering the security and financial interests at issue. "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Holt*, 574 U.S. at 364-65 (cleaned up). Further, "[i]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* (cleaned up). Defendants have not even attempted to make such a showing here. And it is apparent to the Court that there may indeed be less restrictive means to avoid burdening Plaintiff's beliefs. One example is the sanitation and separate preparation procedures that are discussed in the context of pork product cross-contamination in *Simmons*. *See Simmons*, 2011 WL 31066, at *5 (citing evidence that pork is served rarely and is separated from other food by a serving tray; utensils and serving equipment are cleaned using N.Y. Board of Health-approved procedures; the facility is subject to annual health inspections by

Westchester County to ensure, among other things, that dishes are washed at the proper temperature; and that sanitation policies in use were approved by an Imam).[17]  Another is providing Plaintiff with specially packaged meals from an outside vendor – an option apparently undertaken for some inmates but which Defendants have not addressed in the context of this case.  Defendants bear the burden to show that their current policies are the least restrictive means of furthering their asserted security and financial interests, and they have failed to do so. *See Williams*, 895 F.3d at 193 (while government need not grant a party's "full dietary request" under RLUIPA, it must nonetheless demonstrate that the policy chosen is "the least restrictive means of furthering their compelling administrative interests").[18]

Accordingly, I find that Plaintiff has demonstrated a substantial likelihood of success on his RLUIPA claim.

## 2.    First Amendment Free Exercise Claim

The law under the Free Exercise Clause of the First Amendment is less generous to plaintiffs than under RLUIPA, and "a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy 'is reasonably related to legitimate penological interests.'"  *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)).  In making this determination, the Court must

---

[17] If similar or identical procedures are currently in place at the facilities at which Plaintiff has been housed, Defendants have not only failed to say so but, more importantly, have failed to make a record on which I could make such a finding.  *Cf. Jova*, 582 F.3d at 416 ("[T]he failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means.") (cleaned up).

[18] "RLUIPA 'may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise.'"  *Holt*, 574 U.S. at 358 (quoting 42 U.S.C. § 2000cc-3(c)).

consider the four-factor test derived from the Supreme Court's decision in *Turner v. Safley*:
whether there is a "valid, rational connection to a legitimate governmental objective;" the
existence of "alternative means of exercising the burdened right; the impact on guards, inmates,
and prison resources of accommodating the right; and the existence of alternative means of
facilitating exercise of the right that have only a de minimis adverse effect on valid penological
interests."  *Holland v. Goord*, 758 F.3d 215, 222-23 (2d Cir. 2014) (cleaned up) (citing *Turner v.
Safley*, 482 U.S. 78, 90-91 (1987)).

Defendants, while they have failed to demonstrate under RLUIPA that they are burdening
Plaintiff's religious beliefs by the least restrictive means, have nonetheless established that their
current food services policies are rationally connected to legitimate government objectives.
Safety and security in correctional institutions are "undisputedly compelling state interests."
*Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005) (cleaned up).  DOCCS's choice to continue
serving beef in the same messhall in which it serves non-beef products is at least rationally
related to ensuring the safety of inmates and staff.  Further, "it is well established that DOC[C]S
has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate
groups," *Simmons v. Robinson*, No. 07-CV-7383, 2010 WL 5538412, at *10 (S.D.N.Y. Jan. 28,
2010), *report and recommendation adopted*, 2011 WL 31066 (S.D.N.Y. Jan. 4, 2011), and
Defendants suggest that its current policies were designed in part to keep costs down, (*see* Olney
Decl. ¶¶ 5-7).

As to the second *Turner* factor, the option to supplement a diet with "food items
purchased at [a facility's] commissary or received in care packages" has been found to constitute
an alternative means of obtaining a religiously compliant diet.  *Simmons*, 2010 WL 5538412, at
*10.  The bar for this factor is low, and the "ability on the part of [individuals] to participate in

other religious observances of their faith supports the conclusion that the restrictions at issue" are reasonable. *O'Lone*, 482 U.S. at 352. Plaintiff has not asserted that he has no other means of observing his faith.

As to the third *Turner* factor – the impact on guards, inmates, and prison resources of accommodating the right – Defendants' asserted security concerns, the popularity of beef among other inmates, and the administrative and financial burdens all discussed above weigh in favor of Defendants.

Finally, regarding the fourth *Turner* factor, Plaintiff's Complaint and first brief on this motion asserted that only one of two options would protect his religious beliefs: elimination of beef from the DOCCS menu or the creation of a completely separate cafeteria and food service operation to avoid cross-contamination. Assuming that these are the only two options, then there is no alternative means of protecting Plaintiff's rights that has a *de minimis* impact on DOCCS's valid penological interests. *See Holland*, 758 F.3d at 223. In his later filings, however, Plaintiff suggests that he is open to other options. His brief on reconsideration states he would be satisfied with "100% separation of beef products" from his personal meals, (P's Reconsideration Br. at 5), and in his reply brief he suggests that the Court enter an order giving DOCCS "a limited time to implement a viable solution in full consultation and approval of the petitioner," and he pledges to "discuss the matter in good faith with DOCCS . . . so as to reach a solution," (P's Reply at 9). But even if that neutralizes this factor, or tips it in Plaintiff's favor, the other factors in the *Turner* test weigh in Defendants' favor.

Plaintiff thus has not shown a substantial likelihood of success on the merits with regard to his Free Exercise Clause claim.

### 3.      Establishment Clause

In the Second Circuit, courts use "the three-prong analysis articulated by the Supreme

Court in *Lemon v. Kurtzman*, [403 U.S. 602 (1971)]" to assess Establishment Clause challenges.

*Westchester Day Sch.*, 504 F.3d at 355; *see Bronx Household of Faith v. Bd. of Educ. of N.Y.C.,*

650 F.3d 30, 40 n.9 (2d Cir.2011) ("Although the *Lemon* test has been much criticized, the

Supreme Court has declined to disavow it and it continues to govern the analysis of

Establishment Clause claims in this Circuit.").  "Under *Lemon*, government action that interacts

with religion must:  (1) have a secular purpose, (2) have a principal effect that neither advances

nor inhibits religion, and (3) not bring about an excessive government entanglement with

religion." *Westchester Day Sch.*, 504 F.3d at 355 (citing *Lemon*, 403 U.S. at 612-13).  Where an

incarcerated individual challenges the conduct of prison officials, "the *Lemon* test is tempered by

the test laid out by the Supreme Court in *Turner . . .* , which found that a prison regulation that

impinges on an inmate's constitutional rights is nevertheless valid if it is reasonably related to

legitimate penological interests." *Pugh v. Goord*, 571 F. Supp. 2d 477, 494 (S.D.N.Y. 2008)

(cleaned up).

Given the Court's determination that Plaintiff has not demonstrated a likelihood of

successfully showing that the DOCCS actions here run afoul of the *Turner* factors, the Court

need not apply the *Lemon* test.  *See Salahuddin v. Perez*, No. 99-CV-10431, 2006 WL 266574, at

*9 (S.D.N.Y. Feb. 2, 2006).  As with the Free Exercise Clause claim, Plaintiff has not

demonstrated a substantial likelihood of success on his Establishment Clause claim.

### 4.      Equal Protection

"To prove an equal protection violation, claimants must prove purposeful discrimination,

directed at an identifiable or suspect class. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.

1995) (cleaned up).  "But the Supreme Court has created a lower level of scrutiny in determining the constitutionality of prison rules, generally requiring only that prison action be reasonably related to a legitimate penological interest."  *Williamson v. Maciol*, 839 F. App'x 633, 636 n.2 (2d Cir. 2021) (cleaned up).  Thus the Second Circuit applies the "*Turner* standard to the assessment of equal protection claims in the prison setting."  *Id.*

Plaintiff has not shown – beyond conclusory statements and argument – that there is anything purposefully discriminatory about DOCCS's decision to serve beef but not pork in its facilities.  Instead, as noted above, application of the *Turner* factors weighs in favor of a finding that DOCCS's food policies are reasonably related to legitimate penological interests.  This is sufficient to satisfy the Court that Plaintiff does not have a substantial likelihood of success on his Equal Protection claim.

### B.    Irreparable Harm

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (cleaned up).  As already recounted, Plaintiff contends that he is regularly faced with the choice of going hungry or protecting and maintaining his religious beliefs.  Plaintiff has stated that this issue is ongoing, and was exacerbated by his transfer to Collins.  On this record, it appears that his injury is actual and ongoing as long as the challenged DOCCS practices persist.  Plaintiff has thus demonstrated irreparable harm.

C.   <u>**Balance of Hardships and Public Interest**</u>

Finally, in considering a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (cleaned up).  On the one hand, Defendants unquestionably "have an important interest in maintaining institutional order and security and proper allocation of prison resources."  *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 86 (2d Cir. 2021) (cleaned up).  Moreover, Defendants are responsible to the broader statewide prison population.  On the other hand, Plaintiff asserts that he is losing weight and is unable to regularly and reliably access food that does not violate his sincerely held religious beliefs.  (P's Reply at 8.)

With regard to the relief sought in Plaintiff's initial application, either banning beef statewide in DOCCS facilities or providing a fully segregated dining facility in which no beef or pork is stored, cooked, or served, the balance of equities tips in Defendants' favor.  These forms of relief are extreme and would have a drastic and immediate impact on the architecture, security, administration, and finances of the entire DOCCS system, or at least of the entirety of the facility in which Plaintiff resides.  Plaintiff's application for a preliminary injunction in these regards is therefore DENIED.[19]

---

[19] Plaintiff requests that the Court grant leave for interlocutory appeal.  (P's Reply at 11.) I need not do so because Plaintiff has an appeal as of right from this order under 28 U.S.C. § 1292(a)(1).  *See Indep. Party of Richmond Cnty. v. Graham*, 413 F.3d 252, 255 (2d Cir. 2005) (28 U.S.C. § 1292(a)(1) "allows immediate appeals of interlocutory orders of the district courts granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions") (cleaned up).

But the alternative relief Plaintiff seeks in his reply brief, for an order requiring DOCCS officials to confer with Plaintiff directly and to form a viable solution, (P's Reply at 9), is more narrowly tailored and less burdensome to Defendants.[20]  It seems apparent from the parties' submissions that not all possible solutions to this issue have been explored.  Specifically, Defendants claim that Plaintiff has not filled out the proper form to request a special religious meal, and Defendants also claim that at least some religious meals are served packaged.

Accordingly, the following relief is ORDERED on the following schedule.  The date of this Order is defined as the "Order Date."  Defendants are ORDERED to, within two calendar days of the Order Date, designate one or more officials with the power to implement an appropriate religious accommodation for Plaintiff.  Within five days of the Order Date, that official or officials must begin to confer with Plaintiff on a viable accommodation of his religious dietary restrictions,[21] and such discussions shall continue on a daily basis on a reasonable schedule until ten days after the Order Date, or until a mutually acceptable accommodation is reached, whichever is sooner.  One such option the parties must specifically discuss is packaged meals from an outside kitchen.  The parties are to certify to the Court, by joint letter within twelve days of the Order Date, as to the outcome of their discussions.  If the parties do not reach an accommodation by the end of the ten-day period, the joint letter shall

---

[20] Plaintiff indicated his willingness to discuss an individual accommodation designed specifically for him in his reconsideration brief, (*see* P's Reconsideration Br. at 5), which was filed before Defendants' opposition, but Defendants discussed in their opposition only the burdens of a statewide or institution-wide solution.  Thus, while technically Defendants did not have the opportunity to respond to Plaintiff's suggestion in his reply that the parties discuss a mutually acceptable accommodation, they were aware that an individual accommodation was on the table and chose not to address it.  Further, the relief ordered here is no more than the Court could order pursuant to its inherent power to require parties to discuss settlement.

[21] If Plaintiff has not received a copy of this Opinion and Order by the time the official(s) must confer with him, the official(s) shall provide him with a copy before the discussions start.

describe the specific accommodations discussed and the reasons provided by the rejecting party as to each such accommodation.  If the parties have reached an accommodation, Defendants shall certify to the Court within fifteen days of the Order Date that that accommodation has been implemented.

IV.   **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is DENIED in part and GRANTED in part, as described herein.  The Clerk is respectfully directed to send a copy of this Opinion and Order to Plaintiff by overnight mail and by regular mail.

**SO ORDERED.**

Dated:  December 6, 2021
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

24